IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America

v. Case No. 1:26-CR-137-JMC

Demond Barnes

**MOTION TO SUPPRESS EVIDENCE**

Demond Barnes, through undersigned counsel, respectfully moves this Honorable Court to suppress all tangible evidence seized from him during an unlawful warrantless search of his vehicle and person on May 15, 2026.

**Factual Background**

Demond Barnes is charged with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). The charge arises out of a vehicle stop and search that occurred on May 15, 2026.

That day, Barnes was stopped by members of the Make D.C. Safe and Beautiful Task Force[1] because law enforcement officers believed his vehicle's window tint violated D.C. Code § 50–2207.02. This was not an ordinary traffic stop, as it involved at least four police cruisers, and the officers' actions indicated that they were fishing for evidence of other crimes and were relatively uninterested in Barnes's tinted windows. Officer Moreno approached Barnes' vehicle on the passenger front and

[1] Exec. Order No. 14,252, 90 Fed. Reg. 14,559 (Mar. 27, 2025). (deploying a "more robust" presence of Federal law enforcement alongside local law enforcement to achieve a number of goals, one of which is "traffic violations.)

addressed Barnes, telling him the reason he was stopped was due to "heavy tints all throughout the car." Moreno BWC 19:54:35. Moreno then asked for Barnes' identification, place of work, and if there was anything in the Solo cups in his vehicle. Barnes provided Moreno with his identification and the two empty solo cups. Moreno confirmed the cups were empty and placed them back into Barnes's vehicle.

Almost simultaneously, Officer Severino approached Barnes's vehicle on the driver's side. He directed Barnes to roll down his rear windows, and Barnes complied. Severino, after inserting both hands and arms inside the car, saw what he believed to be a container of some marijuana in the driver's side door. He asked Barnes how much marijuana he had, and Severino quickly qualified that he did not "really care about weed" because "it's legal anyways." Severino BWC 19:54:56. Severino directed Barnes to hand him the container and pointed it out by placing both hands inside the interior of Barnes's vehicle. Barnes complied and handed Severino the container. Severino then opened it and asked Barnes if there was "any more wax [in the vehicle]." Barnes, though, did not answer as he was speaking to the officer on the other side of his vehicle.

Meanwhile, Officer Herreros, speaking in Spanish, told Officer Moreno and another officer to look at a bottle in the passenger rear. Both officers broke the plane of the vehicle with their hands, arms, and flashlights to try to get a better look at what Herreros cued them to. Herreros BWC 19:55:13-20.

Severino then looked through the vehicle's front windshield and saw what appeared to be a prescription pill bottle and asked if Barnes took any medications.

Barnes responded affirmatively, and after Severino asked what kind, responded "trazadone." Severino then asked, "do you mind if I take a look?" and Barnes declined. Severino BWC 19:55:42. Severino again asked to see the pill bottle, and Barnes again declined. Only at that point did Severino open the vehicle's door and tell Barnes to step out. Severino BWC 19:56:02.

As Barnes stepped out, Severino asked, "do you mind if I pat you down for any weapons or anything like that?" and before Barnes could answer, Severino began frisking him. Barnes responds, though, "nah, I do mind." *Id*. Severino asked about what he felt on Barne's person while pointing his flashlight at Barnes's waist: "What [do] you got right there? It feels kind of bulky." Barnes responded, "I don't really know" and then started talking into his cellphone. Severino then asked if Barnes had a concealed weapons permit as another officer took his phone from him. Barnes responded that he did not have a permit. Severino ultimately asked if "that's a weapon right there" and Barnes responded, "yes sir." Barnes was then handcuffed, police found the firearm, and Barnes was placed under arrest. Severino BWC 19:56:48.

According to the incident report Officer Moreno authored, on May 16, 2026, Mr. Barnes was "stepped [] out of the vehicle and placed under arrest for possession of THC wax," which "[o]fficers instantly noticed [] in plain view." Moreno also stated in his report that during a"[s]earch incident to arrest, Officer Moreno recovered a black in color handgun from Defendant Barnes front waistband." Moreno testified similarly in the Superior Court at a preliminary hearing. But the body camera footage

belies this account. Officers did not immediately notice any THC products, and Barnes was not searched incident to arrest: he was searched in a pat down after officers told him to exit the vehicle when he refused to give officers items in his vehicle.

## Legal Standard

Generally, warrantless searches are unreasonable, and only a few well-delineated exceptions to the warrant requirement justify a warrantless search. *See United States v. Vinton*, 594 F.3d 14, 19 (D.C. Cir. 2010) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993)). Because the police searched without a warrant, the government has the burden of demonstrating the reasonableness of the officers' actions. Two exceptions to the warrant requirement are relevant to this case: the plain view and *Terry* frisk exceptions. Officers can legally seize an object if they are lawfully in a position to see it and its incriminating nature is immediately apparent. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). And Officers can conduct a protective pat down of someone whom they have reasonable suspicion to believe is armed and dangerous. *See Terry v. Ohio*, 392 U.S. 1 (1968). But neither exception applies to the circumstances of Barnes's case.

The government will likely argue, consistent with Moreno's report and prior testimony, that the officers had probable cause to arrest Barnes because he possessed marijuana, which they observed in plain view. And, pursuant to a search incident to arrest, the officers discovered a firearm. However, officers would not have discovered the marijuana but for their trespass into Barnes's vehicle. And the body camera

footage shows that police did not find the firearm during a search incident to arrest, but rather during a pat down. And that pat down was not supported by reasonable suspicion that Barnes was armed and dangerous. Thus, the fruits of the illegal searches (the firearm, ammunition, magazine, and controlled substances) should be suppressed.

## Argument

### I. Officers were neither in a lawful position to observe marijuana in Barnes's vehicle nor was its incriminating nature immediately apparent.

Police conduct a search when they physically intrude into a person's vehicle to gather information about its contents. *See United States v. Jones*, 565 U.S. 400, 408 (2012) *United States v. West*, 2026 WL 2111018 (D.D.C. July 22, 2026) (finding, after government concession, that an officer conducts a search by inserting his body into a vehicle); *see also United States v. Powell*, 483 F.3d 836, 838 (D.C. Cir. 2007) (recognizing that physically intruding into a vehicle constitutes a search). Before police found a firearm on Barnes or observed what they believed to be marijuana in his vehicle, at least three officers physically intruded into Barnes's vehicle; that physical intrusion was a search not justified by any exception to the warrant requirement. Snips of the body camera footage are pasted below showing Severino breaching the plane of Barnes's vehicle with his flashlight to illuminate the item he suspected to be marijuana.




BWC showing Officer Severino's physical intrusion into Mr. Barnes' vehicle.




BWC showing Officer Moreno's face hand, and flashlight, and Officer [unknown's] entire hand and flashlight inside the rear passenger window.

Moreover, at this point, all that Severino saw was an item he suspected to contain some type of marijuana. However, he did not know or have probable cause at that point that the container held marijuana wax. Nothing about the item revealed that it or its contents were "immediately incriminating." Nor has the government

provided any discovery suggesting that the item contained contraband other than the officers' assertions that the item was an illegal derivative of marijuana.

Other Circuits have categorized this type of intrusion as falling outside of the plain view exception. *See United States v. Powell*, 483 F.3d 836, 838 (D.C. Cir. 2007) ("plain view" exception to the Fourth Amendment's warrant requirement cannot be satisfied when an officer sees suspicious activity only "after he ha[s] 'physically' entered the vehicle"); *see also United States v. Ngumezi*, 980 F.3d 1285, 1289 (9th Cir. 2020) (officer unlawfully "entered the interior space of the vehicle when he leaned in across the plane of the door"); *United States v. Richmond*, 915 F.3d 352, 357 (5th Cir. 2019) (quoting *Jones*, 565 U.S. at 408 n.5) (when officer touches the exterior of a vehicle "in order to help find out what was inside," such physical touching goes beyond "incidental conduct" and triggers Fourth Amendment protections); *United States v. Montes-Ramos*, 347 F. App'x 383, 389–90 (10th Cir. 2009) (concluding that officer's investigative intrusion into "vehicle's air space, even if by only a few inches" constituted "search"). Because officers only observed a jar, whose incriminating nature was not apparent until police commanded Barnes to provide it, after trespassing into his vehicle, the government cannot claim that contraband was in plain view.

Nor were the officers' actions mere "incidental intrusions" into Barnes's constitutionally-protected space. An incidental intrusion has a minimal, fleeting, and non-substantive impact, and is not intended to "obtain[] information." *United States v. Jones*, 565 U.S. 400, 404 (2012). The officers' intrusion into the car was anything

but. Instead, officers repeatedly inserted their flashlights and bodies into the vehicle to illuminate and view otherwise obscured areas on floorboards, under the seats, and in door compartments. The intrusions were *expressly* aimed at obtaining information about what was inside the car, supported by the manner in which they searched throughout the vehicle, but also by Herreros alerting Moreno to further investigate something he believed might be contraband in Barnes' backseat. Speaking in Spanish, Herreros said "Hey Moreno, check the bottle to see if there's any left,"[2] and Officer Moreno moved to search where Herreros indicated.

## II. The Frisk of Mr. Barnes was Unconstitutional.

To perform a protective frisk under *Terry*, officers must have a "reason to believe" that they are dealing with "an armed and dangerous individual." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). That belief must be based on "specific and articulable facts [] taken together with rational inferences from those facts." *Id*. None of the discovery provides any facts that could support a belief that Barnes was armed or dangerous, as officers claimed in prior testimony and in police reports that Barnes was searched incident to arrest, and not as part of a *Terry* frisk. The relevant portion of the transcript is excerpted below.

[2] "Hey Moreno, la botella terminan mira si tiene." Officer Herreros BWC 19:55:13.

Q And so, after noticing this THC wax, and the defendant as the sole occupant in the driver's seat, what did you do next?

A Yeah. We lawfully ordered him to step out of the vehicle, which he complied, and instantly to place him under arrest for possessing a controlled substance, we observed and felt a bulge in his front waistband.

Q Understood. So upon him exiting the vehicle, did you immediately notice the bulge in his front waistband?

A Yes.

But this testimony does not accurately reflect what occurred. Instead, according to body worn camera, Barnes was told to step out of his vehicle after he declined to provide Severino with the bottle of prescription pills in his driver's side door. Severino BWC 19:55:44. At that point, nothing about the traffic stop and nothing about the officers' interaction with Barnes suggested that he was armed or dangerous. Instead, he was calm and cooperative. He did not make any furtive gestures, and contrary to Moreno's testimony, officers did not notice anything on Barnes's body until Severino began frisking him.

Officers did not discover the firearm on Barnes incident to arrest; they discovered it after frisking him without possessing reasonable suspicion that he was armed or dangerous. Thus, their actions were unreasonable, and the fruits of that unreasonable frisk should be suppressed. *See generally Champion v. Untied States*,

307 A.3d 425 (D.C. 2024) (suppressing the fruits of a frisk not supported by reasonable suspicion).

## Conclusion

Police searched Barnes's vehicle when they intruded into the passenger compartment to try to find evidence of criminal activity. Only after intruding into the passenger compartment were they able to find some evidence that Barnes possessed marijuana. However, police were not able to observe anything immediately incriminating until ordering Barnes to provide them with items from his car. Thus, they did not observe contraband in plain view. Further, they only found a firearm after frisking Barnes without reasonable suspicion that he was armed and dangerous. The officers' actions were unreasonable and violated Barnes's rights under the Fourth Amendment. The fruits of their unreasonable searches should be suppressed.

Respectfully submitted,

A. J. KRAMER
Federal Public Defender

_________/s/_________________
BENJAMIN SCHIFFELBEIN
Assistant Federal Public Defender
Federal Public Defender's Office
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004